NONPROFIT LEGAL SERVICES OF UTAH
Aaron C. Garrett, #12519
Andrew D. Fox, #16050
177 East 900 South, Suite 202
Salt Lake City, Utah 84111
Tel: (385) 419-4111
Fax: (801) 401-3504
aaron@nonprofitlegalservices.com
fox@nonprofitlegalservices.com

*Attorneys for Plaintiff John Doe*

<table>
<tr><td colspan="2" align="center">IN THE UNITED STATES DISTRICT COURT,<br>FOR THE DISTRICT OF UTAH, CENTRAL DIVISION</td></tr>
<tr><td>JOHN DOE,<br><br>        Plaintiff;<br><br>v.<br><br>BRIGHAM YOUNG UNIVERSITY,<br><br>        Defendant.</td><td align="center"><br>**COMPLAINT**<br><br>**[JURY TRIAL DEMANDED]**<br><br>Case No. _____<br><br>Judge _____</td></tr>
</table>

Plaintiff John Doe, by and through undersigned counsel of record, hereby files this

Complaint and complains against Defendant Brigham Young University as follows:

## Parties

1.      Plaintiff John Doe is a resident  of Alabama.

2.      Defendant Brigham Young University ("BYU") is a private corporation, with its

principal place of business in Provo, Utah.

**Jurisdiction and Venue**

3.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

5.      John Doe has exhausted his administrative remedies and therefore this matter is ripe for judicial resolution.

**Background**

6.      From January 2002 until on or about March 2013, John Doe was both a student and an employee at BYU, where he pursued multiple degrees and worked at various of its facilities.

7.      As of January 2013, John Doe was employed by BYU in two Graduate Research Assistantship educational opportunities in the Instructional Psychology Department and the Communication Department.

8.      As of October 2012, John Doe was enrolled in a two-year Master's Program in Mass Communication at BYU, a graduate higher education program.

9.      In January 2013, John Doe obtained a curricular practical training opportunity and an employment opportunity at Utah Valley University through BYU.

10.     During 2002 until 2013, BYU and Utah Valley University were receiving Federal financial assistance.

11.     As both student and an employee at BYU, John Doe entered into a contractual relationship with BYU as described herein.

12.      The official BYU Policies provide students and employees accused of disciplinary violations with certain procedural protections before suspension or expulsion.

2

13.     Among other things, BYU operates and maintains the BYU Honor Code Office ("HCO"), which investigates and disciplines students for violations of university policy; BYU Employee Relations Office ("ERO"), which interprets, investigates violations of, and disciplines employees for violations of laws and policies in workplaces at BYU; and the BYU Office of the General Counsel ("OGC"), which provides legal advice to officials and administrators at BYU regarding compliance with laws and Official BYU Policies.

### General Allegations

14.     During his time at BYU, John Doe was accused of committing violations to BYU's policy, which were evidenced by mostly false, inaccurate, and misleading information.

15.     Without John Doe's knowledge and awareness, Defendant prepared and submitted allegation reports, which alleged law and policy violations against him.

16.     Indeed, from 2004 through 2013, BYU received from females at BYU mostly false, inaccurate and misleading allegations against John Doe, including those which would be covered under Title IX.

17.     When John Doe became aware of the allegations, he requested that he be granted the opportunity, pursuant to BYU's policies, to respond to the allegations.  This included, or should have included, being given notice and an opportunity to review the evidence and allegations asserted against him, as well as the chance to respond by presenting material evidence and witnesses to defend himself against those allegations.

18.     BYU adopted, published, and maintained certain grievance procedures, as mandated by federal law and regulation.

19.     Purporting to act pursuant to these policies, BYU began an investigation into complaints lodged against John Doe.

20.     However, BYU's investigation was one-sided and unfair, placing special emphasis on the allegations, witnesses, and supposed evidence supplied by John Doe's female accusers, and discounting his story, witnesses, and evidence on the basis of his sex or gender

21.     As a matter of fact, BYU denied John Doe equitable application of these grievance procedures. Whenever John Doe complained to defendants that the alleged female complainants were presenting false, inaccurate, and misleading allegations against him and requested that BYU equally apply its grievance procedures to him, BYU was deliberately indifferent toward his complaints and denied him the due process he is entitled to receive during such investigations..

22.     Even though John Doe had requested access to the evidence and witnesses against him, the students who allegedly complained and witnessed the allegations continuously graduated or left BYU, which effectively denied John Doe the availability of these witnesses and their testimony.

23.     BYU failed to follow its own procedures and policies and these deficiencies were significant to the point that they could have changed the outcome.

**Alleged Honor Code Violations**

24.     BYU's Student Conduct Policy (the "Honor Code") or the Honor Code Investigation and Administrative Review Process (the "Honor Code Review Process") guarantees that "the student receives from the university, prior to the actual implementation of

any disciplinary action, (i) notice of the nature of the alleged suspected Honor Code violation(s), and (ii) an opportunity to respond."

25.     Additionally, the Honor Code provides for "witnesses or other persons having information about the student and or/the allegations" to be interviewed during the investigatory process.

26.     BYU's Administrative and Staff Employee Grievance Policy (the "Employee Grievance Policy") provides that "Employees who are terminated shall have an opportunity for an administrative review by the Human Resource Committee."

27.     On January 25, 2013, Neal L. Cox ("Mr. Cox"), Associate Dean of Students, provided John Doe with an Allegation Information and Invitation to Respond.

28.     On January 28, 2013, Mr. Cox provided John Doe with a Request to Review Honor Code Office Educational Records, which provided notice to John Doe of four alleged violations.

29.     John Doe did not commit any of the four alleged honor code violations, which were malicious, false, inaccurate, and misleading in their material contents, facts, and presentation.

30.     However, these four allegations were deficiently and unfairly investigated, and as a result, John Doe did not receive the process required by BYU's Policies, as alleged herein and will be revealed through discovery.

31.     For example, a Mr. Fred Odhiambo ("Mr. Odhiambo") had information on the allegation of admission fraud contained in an Allegation Information and Invitation to Respond,

and offered to respond to BYU on behalf of John Doe.  However, BYU's investigators ignored

him and his material submissions to BYU.

32.     In January 2013, John Doe sent an email to Mr. Cox requesting his entire record

in order to ensure that he received notice and an opportunity to respond to all of the allegations

of misconduct against him.

33.     Mr. Cox responded, acknowledging John Doe's request for his records but

denying him his records, stating that his focus is only on the four allegations that were presented

and asking John Doe to "[p]lease consider responding to the four allegations we have presented."

34.     On March 1, 2013, Mr. Cox suspended John Doe after making a determination on

the  allegations, and informed him of the right to appeal the suspension action by requesting an

administrative review through the Office of the Dean of Students.

35.     One week later, John Doe requested that Mr. Cox provide him with sufficient

notice of the grounds for his suspension so he could prepare his appeal.

36.     On March 9, 2013, John Doe filled out an Honor Code Administration Review

application and sent it to Mr. Cox.

37.     Mr. Cox never sufficiently responded to John Doe's application or other requests

for information, and John Doe became concerned that he was never going to enjoy his right to an

appeal.

38.     On March 12, 2013, John Doe wrote to Stephen M. Craig, University counsel,

requesting that the Office of General Counsel review Mr. Cox's suspension determination, and

that the Office help coordinate John Doe's appeals.

39.     Mr. Craig denied John Doe's request for assistance.

40.     Additionally, when John Doe was expelled from BYU, one of the reasons was for his "history of misconduct" dating back to 2005.

41.     However, John Doe was unable to address this alleged "history" because BYU failed to provide him with the requested documents, witnesses, and evidence against him, therefore denying him notice and the opportunity to respond.

## The Supposed Allegations Against Mr. Doe

**Allegation One**

42.     During Spring 2011, John Doe enrolled in Linguistics 330 ("Ling 330") at BYU, which was taught by Professor Deryle W. Lonsdale ("Professor Lonsdale").

43.     Professor Lonsdale alleged that he had "issues" with John Doe regarding plagiarism, which were resolved during the term.  Professor Lonsdale indicated that John Doe told him he was unfamiliar with the relevant policies.  Professor Lonsdale offered to provide "more information," if necessary, regarding this issue.

44.     John Doe never intentionally violated any BYU policies or procedures concerning plagiarism.

45.     Professor Lonsdale apparently sent information concerning his "issues" with John Doe to Mr. Cox or another administrator in November 2011.

46.     Mr. Cox provided John Doe with the above description on January 21, 2013. When he did, John Doe sent an email to Mr. Cox requesting material documentation on the allegation of plagiarism so that he could respond to the allegation thoroughly.

47.     On February 1, 2013, Mr. Cox denied John Doe his request for more information stating that he did not ask the professor for more information.  As a result, John Doe was unable

to adequately and completely rebut all of Professor Lonsdale's specific claims and obtain a fair hearing.

48.     Professor Lonsdale claimed that he addressed the subject of plagiarism on the first day of class, in front of approximately 30 student witnesses.  .  As such, John Doe asked Mr. Cox to interview these witnesses to verify Professor Lonsdale's claims.

49.     However, Mr. Cox denied John Doe's request and never interviewed these witnesses.

50.     An allegation of plagiarism is something of a "scarlet letter" in the academic community.  Simply alleging it against someone can be incredibly damaging to that person's reputation and career.

51.     Rather than conduct the investigation as it should have, BYU prejudged the allegation of plagiarism against John Doe, assuming it to be true even before John Doe had an opportunity to respond.

52.     As a result of the deficient investigation, prejudgment, and insufficient information provided to John Doe, John Doe could not adequately respond to the allegation of plagiarism because he was never made aware of the basis for it.

53.     As it was, John Doe responded to the one specific piece of information he received, which was the short description of the incident that Professor Lonsdale provided to Mr. Cox back in November 2011.  John Doe responded that Professor Lonsdale did not sufficiently discuss the policies concerning citation and plagiarism, but that after the problems were identified, he worked with Professor Lonsdale to resolve the issues.

**Allegation Two**

54.     During January 2012, John Doe drafted a project thesis proposal, in collaboration with staff at Granite Park Junior High School ("GPJHS"), in Salt Lake City, Utah.  Dan P. Dewey ("Professor Dewey") offered to be one of John Doe's advisors on the proposal.

55.     Despite Professor Dewey's trusted position as an advisor to John Doe, Professor Dewey apparently told BYU that John Doe should be denied admissions to the Teaching English to Speakers of Other Languages ("TESOL") Masters of Arts program at BYU on the basis of plagiarism and other untrue allegations.

56.     John Doe had requested feedback from Professor Dewey.  This feedback would have addressed the subject of plagiarism and other allegations that Professor Dewey later asserted against John Doe.

57.     However, Professor Dewey never responded to John Doe's request, and effectively denied John Doe feedback or the opportunity to address whatever his concerns about plagiarism may have been.

58.     In fact, John Doe was denied admission to that program.

59.     Upon receiving the admission denial letter, John Doe met with Professor Wendy Baker-Smemoe ("Ms. Baker-Smemoe"), the author of the denial letter.

60.     John Doe requested that BYU provide him the reasons for his denial and the opportunity to respond in a hearing.

61.     However, Ms. Baker-Smemoe told John Doe that the application deadline had already passed, effectively making the denial decision final.

62.    In February 2013, John Doe asked Mr. Cox for the opportunity to respond to these, and other, plagiarism allegations.

63.    Specifically, John Doe requested that Mr. Cox investigate Professor Dewey's failure to provide John Doe the feedback he was required to provide as his advisor, which would have addressed and prevented the claims of plagiarism and any other claims asserted by Professor Dewey.

64.    Mr. Cox denied John Doe's request to investigate Professor Dewey, explaining that the BYU Honor Code Office and the Office of the Dean of Students had no jurisdiction over investigating cases of misconduct by professors at BYU.

65.    On March 15, 2013, John Doe contacted the BYU Office of the General Counsel ("OGC") regarding the ongoing biased investigations being pursued against him by the Office of the Dean of Student, Mr. Cox and Vernon L. Heperi, the Dean of Students.

66.    Administrative staff at OGC refered John Doe to John Rosenberg ("Dean Rosenberg"), Dean of the College of Humanities at BYU who had administrative authority to investigate Professor Dewey's misconduct and grant John Doe his required impartial hearing.

67.    On March 15, 2013, John Doe contacted Dean Rosenberg, who responded by instructing him that "You can make an appointment . . . through Karmen Smith . . . . I will look forward to meeting with you".

68.    Dean Rosenberg instructed John Doe to make an appointment to meet with him after Thursday, March 21, 2013.

69.    On March 16, 2013, and on March 19, 2013, Mr. Heperi acknowledged John Doe's emails regarding the due process procedures that had been granted by Dean Rosenberg.

70.     However, BYU, through Mr. Heperi, expelled John Doe from BYU on March 20, 2013, before the procedures he was entitled to receive from Dean Rosenberg even began, let alone were brought to a conclusion.

**Allegation Three**

71.     In January 2013, John Doe's female classmate in the Department of Mass Communication at BYU (herein referred to as "Jane Doe") alleged that:

> On Tuesday, December 4, 2012, I was sitting in Dr. Callister's [class] … next to … [John Doe] … Dr. Callister directed the class's attention back to the screen to explain what he wanted us to do. I looked to my left and [John Doe] had placed a piece of paper on top of his lap and held it with his left hand, had unbuttoned and unzipped his jeans and put his right hand inside or his jeans to aggressively scratch his crotch.

72.     Jane Doe's complaint identified nearly seventeen class members and the professor, a Dr. Callister, as witnesses.

73.     Thereafter, Melba Latu ("Ms. Latu") interviewed Jane Doe's witnesses who, by and large, testified that they did not have any evidence that John Doe had sexually harassed Jane Doe.

74.     On February 14, 2013, John Doe submitted a written response to Mr. Cox denying and challenging the credibility of Jane Doe's allegation.

75.     In fact, John Doe did not commit the acts of which he was accused.

76.     On March 4, 2013, Mr. Cox issued a letter to John Doe, dated March 1, 2013, suspending him from BYU over Jane Doe's sexual harassment allegation.

77.     John Doe requested that Mr. Cox provide him with the evidence that he relied upon to implicate John Doe.  Mr. Cox conceded that he found no evidence or witnesses that supported Jane Doe's specific allegation, but that he relied on other supposed violations against

John Doe at BYU to arbitrarily determine that John Doe was "far more likely than not" to be responsible for Jane Doe's allegation.

78.     Before Mr. Cox ever granted John Doe notice and an opportunity to respond to Jane Doe's allegation, which occurred no earlier than January 25, 2013, Mr. Cox had already, by no later than January 24, 2013, prepared a "Suspension Draft" letter intending to suspend John Doe from BYU for an alleged "extensive pattern of inappropriate behavior towards female BYU students."

79.     Additionally, Mr. Cox had already prepared a "Dismissal Draft" letter intending to expel John Doe from BYU for an alleged "extensive pattern of inappropriate behavior against female BYU students spanning more than nine years."

80.     The alleged "inappropriate behavior" in both drafts included Jane Doe's allegation.

81.     Thus, Mr. Cox's investigation and decision were influenced by prejudice or bias against John Doe, in violation of John Doe's rights as guaranteed by BYU's Policies and Title IX.

82.     Under information and belief, BYU, and Mr. Cox specifically, believed Jane Doe because she is a woman and disbelieved and denied John Doe his due process rights to a fair and proper investigation and hearing because he is a man.

83.     Under information and belief, a similarly situated woman would have received her full procedural rights under BYU's policies, and evidence of the same will be revealed through discovery.

84.     Indeed, BYU's preference without factual basis or support of the story told by John Doe's female accuser(s) demonstrates an illegal bias against John Doe as a man and in favor of his female accuser(s).

85.     In her complaint, Jane Doe issued an ultimatum which denied John Doe the opportunity for an equitable and impartial resolution, demanding that:

> If the action taken by the University allows [John Doe] to stay in the Mass Communications Program, even with restrictions, ... I may have to go to measures as extreme as dropping out of the program and leaving BYU.

86.     However, when Mr. Cox's investigations found no evidence or witnesses to support Jane Doe's allegation, Mr. Cox yielded to Jane Doe's demands by unfairly taking disciplinary actions against John Doe rather than drop the charges.

**Allegation Four**

87.     On March 11, 2011, BYU terminated John Doe from his employment with the university partly on the basis of Jane Doe's false and fraudulent allegation of sexual harassment.

88.     Feeling discouraged, John Doe met with some of his classmates to ask for advice about how to be reinstated at his now terminated employment.

89.     After this meeting, Jane Doe alleged that the purpose of the meeting was to retaliate against her for filing the complaint of sexual harassment.

90.     On January 16, 2013, and January 17, 2013, Ms. Latu interviewed and obtained Witness Statement Reports from the participants in John Doe's meeting.

91.     These witnesses refuted Jane Doe's claim of retaliation and testified that John Doe was simply trying to get some advice about how to be reinstatement at his terminated employment.

92.     On February 14, 2013, John Doe submitted a written response to Mr. Cox refuting Jane Doe's allegation of retaliation, and demonstrating his earnest efforts of seek reinstatement at his prior place of employment.

93.     On March 1, 2013, Mr. Cox determined that Jane Doe's allegation of retaliation was unfounded, and absolved John Doe of any wrongdoing by excluding this allegation from his letter suspending John Doe from the University.

94.     On March 4, 2013, Mr. Cox handed the suspension letter to John Doe.  At the same time, Mr. Cox verbally informed John Doe that he believe the allegation of retaliation to be unfounded.

95.     However, on March 20, 2013, Mr. Heperi ignored and disregarded Ms. Latu's Witness Statement Reports, John Doe's response, and Mr. Cox's exoneration letter and expelled John Doe from BYU.

**Allegation Five**

96.     Aside four allegations mentioned above, but BYU also alleged that John Doe had committed fraud in the process of seeking admission to the university.

97.     John Doe was a national of Kenya and maintained a nonimmigrant (F-1) status in the United States.

98.     During February 2012, Mr. Odhiambo, John Doe's relative and guardian, applied for a financial educational bursary for John Doe.  Mr. Odhiambo made the bursary application to the Kenyan Ministry of Higher Education, Science & Technology (hereafter the "Kenya Government"), a department of the executive branch for the national government of Kenya.

14

99.     On April 2, 2012, the Kenya Government issued Mr. Odhiambo a bursary offer letter and a Contract of Support, fulfilling John Doe's "documentary evidence of financial support" which Mr. Odhiambo directly mailed to BYU on behalf of John Doe.

100.    Due to unexpected delays by the Kenya Government in releasing John Doe's bursary finances, John Doe began to experience severe economic hardship while studying in the United States.

101.    Mr. Odhiambo resorted to using his meager personal resources to support John Doe at BYU, pending the release of John Doe's bursary finances.

102.    As John Doe's severe economic hardship persisted, he sought the advice of the BYU Financial Services Office ("BYU FSO"), which gave him the option to utilize BYU's short-term student loans towards his tuition costs, and repay them later.

103.    BYU FSO referred John Doe to the International Student Services Office ("ISSO") at BYU for other financial options available to students on an F-1 visa.

104.    ISSO offered John Doe on-campus, authorized off-campus, and curricular practical training employment options.

105.    On September 11, 2012, Sam Brown ("Mr. Brown"), Director of ISSO, and David Settle ("Mr. Settle"), International Student Advisor for BYU at ISSO, sent a copy of John Doe's bursary offer letter to the Embassy of Kenya in Washington, D.C. (the "Kenyan Embassy") requesting the Kenyan Embassy to "verify that [the letter] was legitimate."

106.    On or about October 3, 2012, John Doe contacted the Kenyan Embassy at the request of Mr. Brown and Mr. Settle. The staff at the Kenyan Embassy notified John Doe that they were conducting investigations into his bursary offer and that the Embassy had asked Mr.

Brown and Mr. Settle to provide them with the original copy of John Doe's bursary offer letter and the Contract of Support.

107.    However, Mr. Brown and Mr. Settle failed to provide the Kenyan Embassy with these two documents, did not make any follow-up contacts with the Kenyan Embassy, and failed to fully cooperate in the Kenyan Embassy's investigations.

108.    On November 4, 2012, Mr. Odhiambo sent an email to Mr. Brown, requesting BYU's parties to directly engage Mr. Odhiambo in relation to John Doe's bursary, stating:

> please contact me only directly for any information on [John Doe's] finance situation. Do not request this information through him. As you may understand, he is too far away in America, and does not have direct access to the information that you are seeking . . . .

109.    On November 8, 2012, Mr. Odhiambo sent an email to Mr. Brown notifying him about the delay in the release of John Doe's bursary finances and explained to Mr. Brown that he was using alternative means of sending money to support John Doe at BYU pending the release of John Doe's bursary finances.

110.    On or about November 12, 2012, Mr. Brown notified Mr. Odhiambo that the staff from the Dean of Students Office would contact Mr. Odhiambo regarding investigations into John Doe's bursary offer by the Kenya Government.

111.    In the meantime, Mr. Odhiambo provided other options for temporarily resolving John Doe's severe economic hardship, including having an American sponsor temporarily assist John Doe and be reimbursed when John Doe's bursary finances were released.

112.    Warner P. Woodworth ("Professor Woodworth"), John Doe's friend and professor at BYU, offered to temporarily support John Doe financially pending the release of John Doe's bursary finances.

113.    Professor Woodworth's support was provided for in the Certificate of Eligibility for Nonimmigrant (F-1) Student Status ("Form I-20").

114.    On November 15, 2012, Mr. Cox acknowledged John Doe's ongoing severe economic hardship.

115.    On January 10, 2013, Ms. Latu and Mr. Cox provided John Doe with an Allegation Information and Invitation to Respond document, which alleged six-points of admission fraud.

116.    John Doe forwarded these allegations to Mr. Odhiambo in order for Mr. Odhiambo to respond directly to Ms. Latu and other parties at BYU.

117.    With no investigations underway, the reasons for the delay in the release of John Doe's bursary finances by the Kenyan Government remained merely speculative. However, the Kenyan Embassy and Mr. Odhiambo offered to conduct thorough and conclusive investigations through the Kenyan Government and provide the information and evidence to BYU.

118.    On January 23, 2013, and on January 27, 2013, Mr. Odhiambo sent two emails to Ms. Latu updating her on the status of John Doe's bursary finances.  Ms. Latu acknowledged receiving these emails, but ignored them and never responded to Mr. Odhiambo.

119.    On February 1, 2013, Mr. Cox prematurely and arbitrarily concluded that John Doe's bursary offer letter was fraudulent and on March 1, 2013, John Doe was suspended from BYU for "submitting false documents," without BYU having properly attempted to receive confirmation of the bursary from the Kenyan Embassy and Mr. Odihambo.

120.    Additionally, Mr. Cox's determination in this regard contained information that was taken out of context, making the factual basis for his conclusions inaccurate.

121.   On March 5, 2013, Mr. Odhiambo sent Mr. Cox a letter from the Kenyan Government's Law Courts dated February 28, 2013, along with an email stating that John Doe's bursary "money indeed exists" and that John Doe's "documentary evidence of financial support" was "not false."

122.   However, Mr. Cox disregarded this evidence and other updates from Mr. Odhiambo.

123.   Additionally, on March 19, 2013, Mr. Odhiambo sent Mr. Heperi the same letter from the Kenya Government's Law Courts dated February 28, 2013, along with an email stating that John Doe's bursary "grant money was genuine, rather than false."

124.   Once again, Mr. Heperi acknowledged receiving this email but ignored and never responded to Mr. Odhiambo.

125.   On March 20, 2013, Mr. Heperi permanently expelled John Doe from BYU for the admission fraud allegations in relation to his bursary offer without ever waiting on the findings from the investigations by the Kenyan Embassy and Mr. Odhiambo.

126.   In fact, John Doe never committed the alleged fraud when applying to the university.

127.   This action by BYU rendered John Doe ineligible to receive his bursary offer through BYU.

128.   Mr. Cox and Mr. Heperi wrongfully believed that John Doe submitted documentary evidence of financial support that "were not in fact from a legitimate governmental organization" and their investigation and decision were in part influenced by James Crane ("Mr.

18

Crane"), who prejudicially testified in his submissions to BYU that John Doe's bursary offer "letter in actuality could be a forgery since numerous forgeries come out of Africa."

129.    However, the Kenyan Embassy, which is the official diplomatic mission and extension of the Kenyan Government in the United States, has confirmed that the "Ministry of Higher Education, Science & Technology", which offered John Doe the bursary, was indeed a legitimate organization and offered overseas bursaries to Kenyan national students.

**Alleged Title IX Violations**

130.    Apparently throughout the course of John Doe's employment and enrollment at BYU, Defendants received and compiled numerous inaccurate and misleading allegations of alleged "Title IX Violations" against John Doe.

131.    BYU's Gender Policy provides that "[a]n adequate, reliable and impartial investigation will be undertaken in a prompt and equitable manner…The university will, in good faith, attempt to conclude the investigation within sixty (60) days of receiving the complaint."

132.    Additionally, BYU's Gender Policy provides "[i]f . . . the investigation cannot be concluded within sixty (60) day period, the accused and the aggrieved will be provided with notice of a specific time frame for concluding the investigation and . . . periodic reports regarding the status of the investigation . . . [as well as] notice of the outcome of the investigation."

133.    However, Defendants did not comply with BYU's Gender Policy by failing, among other things, to provide John Doe with notice and periodic reports of the status of the investigations for the specific Title IX allegations.

134.    Instead, BYU essentially sandbagged John Doe with a host of inaccurate and false allegations, and denied him the right to conduct contemporaneous investigations or defenses of the same.

135.    Indeed, BYU administrators with the authority to institute corrective measures deliberately denied John Doe of the process set forth above.  For example, on February 7, 2005, Ms. Schmidt, the Equal Employment Opportunity Manager, "interview[ed] a number of student employees" regarding the allegations against John Doe but failed to provide John Doe with more information in order to "maintain confidentiality."

136.    BYU has suffered from a rash of negative stories in the media related to its investigations into sexual assault cases.

137.    Out of a fear of being criticised from students, the media, the general public, or otherwise for failing to take sexual harassment claims seriously, BYU placed unwarranted weight and confidence in the allegations of John Doe's female accusers because they were women, and discounted John Doe's story because he was a man.

138.    As such, BYU's decision-maker(s) and its investigator(s) were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault.

139.    Indeed, the university seriously neglected its duties to conduct a full and fair investigation because the accusations were being levied by a woman against a man.  BYU failed to follow up on John Doe's witnesses or other witnesses who could have refuted his accuser's story, did not disclose to him the evidence against him, and prejudged the outcome of the disciplinary process before it ever began at least in part because John Doe is a man.

140.    In these ways and others that will be revealed through discovery, John Doe was deprived his due process and procedural rights to which he is entitled under the law.

141.    Between June 25, 2011, and December 29, 2011, John Doe was employed as a cafeteria worker in BYU's MTC Cafeteria.

142.    In November 2011, two alleged Title IX violations were brought against John Doe. Dean Wright ("Mr. Wright"), Director of BYU Dining Services, and Douglas Walker ("Mr. Walker") restricted John Doe's employment and requested that Sue DeMartini, Equal Opportunity Manager and Deputy Title IX Coordinator for BYU, conduct an investigation into the allegations.

143.    The first complaint alleged that John Doe made two sister missionaries feel uncomfortable by challenging them on the appropriateness of their decision to serve on a mission for the LDS Church.

144.    John Doe denied this allegation and provided Ms. DeMartini with three other sister missionaries and two colleagues who were present and witnessed the interaction.

145.    Ms. DeMartini confirmed that she did not investigate this allegation and did not interview John Doe's witnesses but rather relied on the initial complaint only.

146.    The second complaint alleged that John Doe asked a female co-worker if she had breast implants.

147.    John Doe denied this allegation and provided Ms. DeMartini with at least six of his co-workers who were present at the time and place of the alleged incident as his witnesses.

148.    Ms. DeMartini interviewed the complainant and all of her witnesses and obtained their investigation reports.  However, Ms. DeMartini did not interview John Doe's witnesses and denied John Doe the opportunity to respond, rebut, explain, or put forth any evidence.

149.    As a result of these biased investigations, John Doe sent an email to Mr. Wright complaining of Ms. DeMartini's conduct, although Mr. Wright never instituted any corrective investigations to address the unfair and incomplete nature of Ms. DeMartini's investigation.

150.    In January 2012 and January 2013, Ms. DeMartini and Mr. Woodard notified John Doe about the existence of alleged Title IX violations and employment violations dating back to 2005, even citing several of the violations.  However, when John Doe requested that he be given the due process provided for in BYU's Gender Policy and grievance procedures, Ms. DeMartini and Mr. Woodard denied his request and therefore he was not allowed to respond to, rebut, explain, correct, and put forth his material evidence and witnesses to each specific alleged violation, dating back to 2005.

151.    On January 11, 2013, Mr. Woodard issued a memorandum to John Doe permanently dismissing him from "employment of any kind at Brigham Young University" as "a result of the numerous complaints . . . received over the years dating back to 2005."

152.    John Doe protested that BYU was yet to provide him with any notice or opportunity to be heard dating back to 2005, and requested the due process provided for in the BYU Policies.

153.    On January 18, 2013, Ms. DeMartini reiterated to John Doe that he was notified verbally and in writing that he no longer was eligible for employment at BYU.  Ms. DeMartini told him that because inappropriate comments and behavior fall within the purview of the BYU

Gender Policy, John Doe had the right to appeal and could request a review before the Assistant Administrative Vice President of Human Resource Services, a Mr. Forrest Flake ("Mr. Flake").

154.    On March 12, 2013, Ms. DeMartini sent an email to John Doe inviting him to pick up the allegations record from her office in order to prepare his appeal.

155.    That same day, John Doe went to collect the allegation record only to find that the granted records were grossly deficient and did not comprise nearly all of the allegations dating back to 2005.

156.    Ms. DeMartini instructed John Doe to request any missing allegation records and appeal information through Mr. Flake.

157.    On March 15, 2013, John Doe emailed Mr. Flake and requested a meeting to supplement the deficient records.  However, at the meeting on March 19, 2013, Mr. Flake instructed John Doe to obtain the records from Ms. DeMartini.

158.    On March 15, 2013, John Doe also sent an email to Mr. Heperi reminding him about his requested due process for at least four other separate cases that BYU was handling through separate departments, including cases by Mr. Flake, Ms. DeMartini, the BYU Police Department, and the College of Humanities.

159.    On March 16, 2013, Mr. Heperi acknowledged John Doe's email and corresponded with Mr. Flake, Ms. DeMartini, Police Chief Larry Stott from the BYU Police Department, Dean Rosenberg from the College of Humanities and Mr. Craig from the Office of General Counsel.

160.    On March 19, 2013, John Doe sent Mr. Heperi a follow-up email reminding him of his request to allow him the opportunity to clear any allegations against him with the other

departments on the BYU campus.  Mr. Heperi acknowledged John Doe's email and forwarded the email and his acknowledgment to Mr. Cox.

161.    However, on March 20, 2013, just one day later, Mr. Heperi expelled John Doe from BYU for inappropriate gender-based behavior and a history of misconduct, which included 26 count of Title IX violations dating back to 2005.  John Doe was thereafter required "to sever all formal communications with [BYU] . . . effective immediately."

162.    John Doe was never given the opportunity to be heard and confront the allegations against him, but rather the expulsion action deliberately terminated and denied John Doe access to all his grievance procedures available at BYU and to which he was entitled.

**Alleged Employment Violations**

163.    BYU's Administrative and Staff Employee Grievance Policy (the "Employee Grievance Policy") provides that "Employees who are terminated shall have an opportunity for an administrative review by the Human Resource Committee."

164.    On January 11, 2013, Mr. Woodard also terminated John Doe's employment with BYU for allegations of unsatisfactory performance and disregard of supervisor directives, supposedly dating back to 2005.

165.    On January 18, 2013, Ms. DeMartini did not allow John Doe to appeal this decision, stating "As a student employee, you do not have the right to appeal based on . . . unsatisfactory performance and disregard of supervisor directives."

166.    However, John Doe should have been given an opportunity for an administrative review pursuant to the Employee Grievance Policy.

**BYU Police Department Allegations**

167.    On or about February 2009, police lieutenant Arnold Lemon from the BYU Police Department provided John Doe with brief paragraph extracts of select allegations against him.

168.    On February 11, 2009, John Doe requested from Chief Stott full notice and an opportunity to be heard for the allegations against him by the police department.

169.    However, on February 17, 2009, John Doe's request was denied.

170.    As mentioned above, On March 16, 2013, and March 19, 2013, Mr. Heperi acknowledged John Doe's requests for due process from the police department.

171.    Nonetheless, at least some of the violations for which John Doe was expelled on March 20, 2013, were given to Mr. Heperi by the police department, and John Doe was never given the opportunity to respond in any meaningful way.

172.    On July 23, 2013, Sergeant Mike Mock relied on these false allegations to ban John Doe from the Harold B. Lee Library at BYU.

<u>John Doe's Attempts to Transfer and Immigration Status</u>

**Maintenance of F-1 Status**

173.    John Doe maintained a lawful nonimmigrant (F-1) status, an active SEVIS record, and valid "Form I-20" in the United States.

174.    During all relevant times, the Atlanta English Institute (AEI), located in the city of Atlanta, Georgia, and BYU, were SEVP-certified schools.

175.    BYU placed its ISSO under the administrative control of Mr. Heperi and the Office of the Dean of Students.

176.    The staff at ISSO was comprised of Mr. Brown and several senior International

Student Advisors, including Mr. Settle, Miles J. Ogden ("Mr. Ogden"), Cristi Mateani ("Ms.

Mateani"), and Vanessa Ocana ("Ms. Ocana").

177.    Mr. Brown and these advisors had access to the SEVIS system that is maintained

by the U.S. Department of Homeland Security.

178.    The ISSO was responsible for transferring the F-1 SEVIS records of F-1 students

between BYU and other SEVP-certified schools in compliance with federal law.

179.    BYU, through the ISSO, also instituted its own policies and procedures with

regard to maintaining student immigration records, complying with federal immigration law, and

generally ensuring that the university does everything it is required to do so that a student's, or a

former student's, immigration status is not threatened.

180.    As described herein, BYU violated those policies with respect to Mr. Doe,

breaching its contract with him.

181.    On October 2, 2012, John Doe contacted and applied to a pre-doctoral degree

program (GRE/GMAT) at AEI to study as an F-1 student.

182.    On March 15, 2013, John Doe contacted AEI by phone to inquire about his

admissions status at AEI. Ms. Salima Abdul Sultan, the Admissions Official at AEI confirmed to

John Doe that he had been accepted to AEI. She explained to him that AEI would send him his

official admissions acceptance letter via email, which would be addressed to BYU.

183.    In the meantime, she sent John Doe a "F-1 Student Transfer-In" form to complete,

in order to facilitate the transfer of his SEVIS record from BYU to AEI.

184.    John Doe shared the good news of his acceptance to AEI with Mr. Ogden, who responded by granting John Doe the "Transfer Out Form" for BYU. Mr. Ogden instructed John Doe to fill out both BYU and AEI's SEVIS transfer forms and return them to him so he could process the transfer out of John Doe's SEVIS record from BYU to AEI.

185.    On March 15, 2013, John Doe filled out the AEI form and the BYU form with as much information as he had at the moment.

186.    As noted on both of these SEVIS transfer forms, John Doe filled out the forms on March 15, 2013.

187.    Since John Doe had not yet received his admissions offer letter from AEI as of March 15, 2013, he filled out both forms with tentative date information. In AEI's "F-1 Student Transfer-In" form he responded to the question "What is the transfer out date in SEVIS?" by filling in "Not yet requested". In BYU's F-1 "Transfer Out Form" he filled in the tentative "SEVIS release date" of "04/26/2013". He handed both partially filled out forms to Mr. Ogden.

188.    John Doe planned to replace the tentative date information with a definitive SEVIS transfer out date upon receiving his official acceptance letter from AEI.

189.    On March 18, 2013, AEI notified BYU, in an official acceptance letter emailed to John Doe, that John Doe "has been officially accepted to the Atlanta Language Institute (AEI)".

190.    By this notice, AEI requested BYU to transfer out John Doe's active SEVIS record to AEI. Indeed, AEI provided to BYU AEI's SEVIS school code "ATL 214F 015540," to facilitate the correct transfer of the SEVIS record to AEI.

191.    John Doe printed out and handed his acceptance letter from AEI to Mr. Ogden, who acknowledged AEI's notification and request for SEVIS transfer by signing the AEI "F-1 Student Transfer-In" form, on March 18, 2013.

192.    To ensure compliance with U.S. federal laws and policies that govern the transfer of SEVIS records between SEVP-certified schools, Mr. Ogden calculated the difference between John Doe's newly requested SEVIS transfer date of "March 18, 2013" and the "October 15, 2013" enrollment date on AEI's acceptance notice letter. Mr. Ogden established that the difference between these dates was more than 5 (five) months.

193.    Mr. Ogden then advised John Doe that the policy requires that the enrollment date at the transfer-in school be within 5 (five) months of the SEVIS record release date at the transfer-out school.

194.    Mr. Ogden asked John Doe to contact AEI right away and request AEI to offer him an earlier enrollment date that was within five (5) months of March 18, 2013.

195.    In the meantime, Mr. Ogden partially processed John Doe's SEVIS record transfer to AEI and had ISSO send John Doe an email notifying him that "Your transfer letter has been filled out and faxed to the Atlanta English Institute."

196.    On March 18, 2013, John Doe contacted AEI by phone to obtain an earlier enrollment date. A phone receptionist at AEI notified John Doe that AEI's admissions office had closed for the day, and instructed John Doe to call back on the following day.

197.    On March 19, 2013, John Doe contacted AEI again. AEI's admissions office offered him an earlier enrollment date of June 17, 2013. John Doe immediately returned to Mr.

Ogden's office to have Mr. Ogden update his SEVIS records at BYU with the new enrollment date information, and release John Doe's SEVIS record to AEI.

198.    Upon John Doe entering Mr. Ogden's office, Mr. Brown walked into Mr. Ogden's office and ordered Mr. Ogden to immediately stop and discontinue the transfer of John Doe's SEVIS record to AEI.

199.    Mr. Brown explained that Mr. Heperi had ordered that BYU must retain and not transfer out John Doe's SEVIS record to AEI or any other SEVP-certified school that accepts him.

200.    Mr. Ogden and John Doe protested against Mr. Brown's order, stating that AEI had already officially notified BYU of John Doe's acceptance to AEI, and requested the transfer of his SEVIS record in active status to AEI, as required by U.S. federal laws and policies.

201.    Mr. Brown insisted that BYU will comply with Mr. Heperi's order. Mr. Brown disregarded Mr. Ogden and John Doe's protests and denied Mr. Ogden any opportunity to update John Doe's SEVIS transfer forms with the new June 17, 2013 date, and release the SEVIS record to AEI.

202.    Mr. Ogden became visibly shaken over Mr. Brown's deliberate disregard for SEVIS record transfer laws and policies.

203.    John Doe became completely filled with anxiety and grief owing to BYU's deliberate unlawful actions of denying him his nonimmigrant (F-1) rights.

204.    On March 20, 2013, Mr. Brown called John Doe and notified him that he had terminated John Doe's SEVIS record in the SEVIS system, effectively depriving John Doe of his maintenance of F-1 status in the United States.

205.    Mr. Brown then directed John Doe to immediately depart the United States, without providing him with any alternative avenues.

206.    By his own admission, Mr. Brown was aware of the United States "federal regulations and policies" that mandated the transfer of an F-1 student's SEVIS records between SEVP-certified schools, but deliberately disregarded these statutes.

207.    On March 22, 2013, John Doe sent an email to Mr. Brown requesting that he transfer John Doe's terminated SEVIS record to AEI so that AEI could assist John Doe with SEVIS reinstatement through United States Citizenship and Immigration Services ("USCIS").

208.    Mr. Brown responded, notifying John Doe that "Atlanta English Institute has declined to accept [John Doe's] terminated SEVIS record," explaining that AEI does "NOT accept terminated records" and does "NOT help with reinstatements" of SEVIS records, notwithstanding that it was BYU's intentional misconduct that caused the records to enter into a terminated status.

209.    Between March 21, 2013, and March 22, 2013, John Doe contacted, applied to, and was accepted to Selnate International School ("Selnate"), another SEVP-certified school.

210.    Tracy Rogers ("Mr. Rogers"), the Director for Selnate, offered to assist John Doe with applying for the reinstatement of his terminated SEVIS record, through USCIS.

211.    On March 25, 2013, Mr. Rogers requested additional reinstatement information from BYU through Mr. Brown and Ms. Mateani.

212.    Specifically, he requested an explanation for "why BYU would terminate [John Doe's SEVIS] record rather than let [John Doe] transfer [it out] in [active] status."

213.    On March 26, 2013, Mr. Heperi responded to Mr. Rogers' emails stating that he was "unable to respond to [Mr. Rogers'] request for more information" to assist Selnate in applying for John Doe's SEVIS reinstatement.

214.    As a result, Mr. Rogers was unable to assist John Doe.

215.    In addition, he was forced to rescind John Doe's admissions to Selnate on April 8, 2013, by explaining to John Doe that:

> We have received very limited information back from BYU, but more importantly, we have reviewed your situation with our senior staff and feel that it would be best if we did not accept your request and application at this time. I suggest you look elsewhere for help in applying for reinstatement if you feel you have a strong case to do so.

216.    With Mr. Heperi's deliberate refusal and failure to cooperate in Selnate's efforts to reinstate John Doe's terminated SEVIS record, Mr. Heperi further denied John Doe the reinstatement to and maintenance of his F-1 status in the United States.

217.    On or about March 26, 2013, Mr. Brown contacted Utah Valley University and terminated John Doe's CPT, effectively denying John Doe the benefits of his active F-1 status. Duane Miller, John Doe's CPT supervisor at Utah Valley University, notified John Doe via email of Mr. Brown's termination of his CPT.

218.    Mr. Cox alleged that John Doe violated BYU's "university policy" or "Church Educational System Honor Code," which requires BYU students to "[b]e honest." He claimed that John Doe was not honest in his application for admission to BYU, because his "documentary evidence of financial support" were allegedly "falsified." As a result, Mr. Heperi expelled John Doe from BYU for the allegation of "admission fraud", as provided for by BYU's "Honor Code Investigation and Administrative Review Process".

**Auburn University**

219.    After leaving BYU, John Doe became a student and an employee at Auburn University ("Auburn"), beginning in January 2014.

220.    On February 18, 2015, Mr. Heperi released John Doe's most recent allegation record without his consent to George T. Flowers ("Mr. Flowers"), Dean of the Graduate School at Auburn.

221.    On March 5, 2015, Mr. Flowers relied upon this information to expel John Doe from Auburn for not being "a student in good standing with [BYU]."

222.    As a result, John Doe was grief stricken and sought counseling at Auburn's Student Counseling Services.

223.    John Doe also sought marriage counseling from the Auburn Marriage and Family Therapy Center as BYU's action caused and aggravated great friction between John Doe and his wife.

224.    To date, John Doe has been unable to access Auburn's educational opportunities because Auburn maintains that John Doe "is not permitted to register for or attend classes at Auburn" until the allegations against him at BYU are resolved and corresponding information that reflects his "good standing" with BYU is released to Auburn.

225.    However, this is an impossible task as BYU denied and continues to deny John Doe any process for the resolution of these allegations.

226.    BYU and specifically, Mr. Heperi, maintain that BYU will continuously and indefinitely release these unresolved allegations against John Doe to other schools where John Doe seeks to enroll.

## The Aftermath

227.    On July 23, 2013, without any prior notice or hearing, BYU issued a letter to John Doe permanently banning him from the BYU campus.

228.    Thereafter, the BYU police department enforced this ban by handing John Doe the letter banning him from the campus, harassing him, and aggressively escorting him off the BYU campus.

229.    John Doe has suffered major depression, accute PTSD, and extreme mental and emotional distress due to BYU's actions and has sought therapy from professional licensed therapists to deal with this suffering.

230.    On June 16, 2015, John Doe requested from BYU "a listing of specific incidents and their accompanying dates upon which Mr. Heperi based his dismissal action" against him.

231.    On July 25, 2015, Mr. Craig responded by initially releasing a listing of 35 Honor Code Title IX Violations.  The listing had nearly 28 additional violations, none of which John Doe knew about.

232.    On August 27, 2015, Mr. Craig obtained from Mr. Heperi the files containing John Doe's alleged history of misconduct at BYU and released them to Mr. Doe.  The files contained extensive allegations and investigations over the years totaling 1,131 pages.

233.    John Doe had not been made aware of most of these allegations until this point.

234.    Nonetheless, it appears that these hidden and unrevealed allegations played a large part in BYU's decision to terminate John Doe's employment, expel him from the school, prohibit him from ever visiting the campus, as well as the university's continuing practice of

spreading disinformation and false allegations about John Doe to the subsequent educational institutions at which he has attempted to enroll and obtain a terminal degree.

## FIRST CAUSE OF ACTION
### Breach of Contract

235.    John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

236.    BYU's employment and student policies are valid, binding, and existing contracts to which John Doe and the Defendants are parties.

237.    John Doe has performed all of his obligations under BYU's Policies, or to the extent he has not, performance has been excused.

238.    Defendants have breached BYU's Policies by their conduct described herein and as will be revealed through discovery and presented at trial.

239.    John Doe has been damaged by Defendant's breach in an amount to be proven at trial.

## SECOND CAUSE OF ACTION
### Breach of the Covenant of Good Faith and Fair Dealing

240.    John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

241.    An implied covenant of good faith and fair dealing inheres in every contract.

242.    Under the covenant of good faith and fair dealing, both parties impliedly promise not to intentionally do anything to injure the other party's right to receive the benefits of the contract.

243.     By suspending and expelling John Doe without providing him the process granted in BYU's Policies, and other acts described herein and will be revealed at trial, Defendants have denied John Doe the fruits of those contracts, thereby breaching the implied covenant of good faith and fair dealing.

244.     John Doe has been damaged by Defendant's breach in an amount to be proven at trial.

## THIRD CAUSE OF ACTION
### Defamation

245.     John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

246.     The information in John Doe's Suspension Letter, Expulsion Letter, and BYU's information release to Auburn is false.

247.     This information was not a privileged communication.

248.     In publishing this information, BYU acted at least with negligence, if not intentionally, for the purpose of damaging John Doe's educational and employment opportunities at Auburn, and any subsequent professional opportunities arising from the completion of his degree at that university.

249.     John Doe has been damaged by Defendants' defamation in an amount to be proven at trial.

## FOURTH CAUSE OF ACTION
### Violation of Title IX--Due Process and Procedural Rights

250.     John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

35

251.     Defendant receives Federal financial assistance.

252.     BYU, as a recipient of Federal financial assistance, is required to adopt and publish grievance procedures providing for the prompt and equitable resolution of student complaints alleging any action which would be prohibited by Title IX or its regulations.

253.     As part of this requirement, BYU is obligated to provide an investigative and disciplinary process that must protect the due process rights of all parties involved.

254.     For the reasons contained herein, and as will be revealed through discovery, BYU fell far below this standard when it came to its investigation and discipline of John Doe.

255.     This failure was due to BYU's preferential treatment of John Doe's female accuser, who was accorded special status and privileges on the basis of her sex.  Similarly, John Doe's story was discounted and the investigative and disciplinary process was stacked against him because he is a male.

256.     On top of that, BYU completely failed to provide an investigative and disciplinary process to John Doe, for all other alleged Title IX violations for which it expelled him from his educational and employment opportunities at BYU.

257.     Defendant's student disciplinary process is, as implemented, contrary to Title IX because John Doe was on the basis of sex, excluded from participation in, denied benefits of, and subjected to discrimination under Defendant's disciplinary process.

258.     John Doe has been damaged by Defendants' violation in an amount to be proven at trial.

## FIFTH CAUSE OF ACTION
## Violation of Title IX--Deliberate Indifference

259.     John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

260.     Defendant receives Federal financial assistance.

261.     Through his unfair and unjust disciplinary proceedings, John Doe suffered harassment on the basis of his sex that was sufficiently severe, pervasive, and objectively offensive that it effectively barred him access to an educational opportunity or benefit.

262.     BYU university officials with the authority to take corrective action had actual knowledge of John Doe's complaints of harassment and unfair treatment.

263.     BYU was deliberately indifferent in its response or lack thereof because it responded in a way that was clearly unreasonable under the circumstances, including but not limited to because the university expelled John Doe and took other action adverse to him before he was even able to meet with the administrators to whom he had complained.

264.     Rather than investigate these charges as they should have done, these very same university administrators relied upon the uninvestigated allegation to dismiss John Doe and terminate his relationship with BYU.

265.     John Doe has been damaged by Defendants' violation in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION
## Violation of Title IX--Erroneous Outcome

266.     John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

267.    Defendant receives Federal financial assistance.

268.    BYU's pattern of decision-making throughout the disciplinary proceedings was discriminatorily applied in favor of John Doe's female accusers and against John Doe on the basis of his sex, as is alleged herein and will be identified through discovery.

269.    John Doe was wrongly found to have engaged in a history of misconduct against female students at BYU over a period time and punished with expulsion from the University and his employment, when indeed no proper process was ever conducted prove his guilt or innocence.

270.    As a result, the outcome of Defendant's disciplinary proceedings was erroneous because of a sexual bias, favoring and preferring the allegations of John Doe's female accuser and disfavoring John Doe because he is a man.

271.    John Doe has been damaged by Defendants' violation in an amount to be proven at trial.

## SEVENTH CAUSE OF ACTION

### Violation of Title IX--Selective Enforcement

272.    John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

273.    Defendant receives Federal financial assistance.

274.    The Defendants' actions constitute selective enforcement against John Doe as they were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings and/or would have received the full and fair process to which she is entitled under BYU policies and the law.

275.    BYU administrators received complaints against John Doe, that were mostly presented by female complainants. BYU selectively applied its disciplinary procedures to female complainants by intentionally and deliberately granting only the females due process protections but denying the John Doe the same due process protections because he was a male.

276.    BYU granted the female complainants the right to present their complaint accounts, evidence and witnesses to BYU administrators who had authority to institute the corrective measures. On the basis of the complainants' accounts, evidence and testimonies presented by their witnesses, BYU expelled John Doe from his employment and educational program at BYU, thereby violating his Title IX rights.

277.    Furthermore, BYU granted John Doe's accuser access to the witnesses, materials, evidence, and other privileges that it denied to John Doe throughout the course of the investigation, even though he repeatedly requested the same from the university in writing.

278.    BYU therefore discriminatorily applied its disciplinary procedures with sexual bias by intentionally and deliberately favoring females against the male John Doe.

279.    In these ways, and others that will be revealed through discovery, people of the opposite gender in circumstances sufficiently similar to John Doe's were treated more favorably by BYU.

280.    A similarly situated female student would have received the full due process to which she is entitled, or would have otherwise been treated more favorably by the university, than was John Doe, and as a result of a proper investigation, would not have been subject to disciplinary proceedings based on false and fraudulent allegations.

281.    John Doe has been damaged by Defendants' violation in an amount to be proven at trial.

### EIGHTH CAUSE OF ACTION
### Violation of Immigration Law

282.    John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

283.    John Doe was a nonimmigrant (F-1) student in the United States and maintained an active SEVIS record and valid Form I-20.

284.    BYU is a SEVP-certified school and operated International Student Services Office that managed the transfer of SEVIS records between BYU and other SEVP-certified schools.

285.    BYU is obligated under federal law to maintain these records and transfer them between schools, upon transfer request by the F-1 student.

286.    On or about March 15, 2013, John Doe desired to transfer out of BYU and was accepted to AEI, a SEVP-certified school.

287.    John Doe notified BYU of his intent to transfer and that he intended to transfer to to AEI.

288.    Upon notification, BYU failed to properly update John Doe's SEVIS record as a "transfer out" student with a release date, or otherwise failed to maintain this his record appropriately and in accordance with Federal law.

289.    BYU's failures included that it did not process the paperwork required to grant AEI access to John Doe's SEVIS records.

290.   BYU's actions with regards to John Doe's transfer request, carried out by its designated school official(s), is conduct that does not comply with Federal regulations.

291.   The statements of BYU's designated school official(s) made in connection with John Doe's transfer request were false.

292.   Defendants deliberately and maliciously deprived John Doe the maintenance of his nonimmigrant (F-1) status when they refused to process John Doe's SEVIS record transfer to AEI, thereby rendering him out of status, and deportable.

293.   John Doe has been damaged by Defendants' violation in an amount to be proven at trial.

## NINTH CAUSE OF ACTION
### Intentional Infliction of Emotional Distress

294.   John Doe incorporates the allegations of the preceding paragraphs as if fully stated herein.

295.   BYU's conduct was outrageous and intolerable in that it offended against the generally accepted standards of decency and morality.

296.   BYU intended to cause, or acted in reckless disregard of the likelihood of causing, emotional distress.

297.   John Doe suffered severe emotional distress.

298.   BYU's conduct proximately caused John Doe's emotional distress.

299.   John Doe has been damaged by BYU's violation in an amount to be proven at trial.

## TENTH CAUSE OF ACTION
### Negligence

300.    John Doe incorporates the allegations of the preceding paragraphs as if fully

stated herein.

301.    BYU owed John Doe a duty of care to carry out a reasonable and fair

investigation into the allegations against him, as outlined in its school and employment policies.

302.    As described herein, BYU's conduct well fell below the standard of care resulting

in a breach of its duty to John Doe.

303.    John Doe suffered an injury or loss due to the breach, including his termination

and expulsion.

304.    BYU was the cause in fact and proximate cause of John Doe's injury or loss.

305.    John Doe has been damaged by Defendants' violation in an amount to be proven

at trial.

### PRAYER FOR RELIEF

WHEREFORE, John Doe prays for relief on its causes of action as follows:

A.    On his first cause of action, for damages, in an amount to be proven at trial.

B.    On his second cause of action, for damages, in an amount to be proven at trial.

C.    On his third cause of action, for damages, in an amount to be proven at trial.

D.    On his fourth cause of action, for damages, in an amount to be proven at trial.

E.    On his fifth cause of action, for damages, in an amount to be proven at trial.

F.    On his sixth cause of action, for damages, in an amount to be proven at trial.

G.    On his seventh cause of action, for damages, in an amount to be proven at trial.

H.     On his eighth cause of action, for damages, in an amount to be proven at trial, and for an order terminating BYU's SEVP certification and ability to participate in the SEVP and SEVIS program(s) for conduct on the part of a designated school official that does not comply with Federal regulations, and any other grounds that are revealed throughout the course of this case.

I.     On his ninth cause of action, for damages, in an amount to be proven at trial.

J.     On his tenth cause of action, for damages, in an amount to be proven at trial.

K.     On all causes of action, damages in an amount not less than three million dollars, including compensatory, consequential, and punitive damages where appropriate, compensation for the pain and suffering he has incurred, for an order requiring BYU to revise John Doe's transcript to reflect that he received an A grade in each class for each semester affected by the reports alleged herein, the unlawful investigation, and the improper expulsion to which he was subject, reimbursement for all costs and attorney fees, pre- and post-judgment interest, for an order requiring BYU to list him as a student and employee in good standing, and any other and further relief to which he is entitled and that the Court may find appropriate under the circumstances.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff John Doe hereby demands a trial by jury on all issues so triable.

DATED this 31st day of October, 2016.

NONPROFIT LEGAL SERVICES OF UTAH

  /s/ Aaron C. Garrett
Aaron C. Garrett
Andrew Fox