# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JOHN OIRYA,<br><br>    Plaintiff,<br><br>vs.<br><br>**BRIGHAM YOUNG UNIVERSITY,**<br><br>    Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING DEFENDANT BRIGHAM YOUNG UNIVERSITY'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:16-cv-01121-BSJ<br><br>Judge Bruce S. Jenkins |

On December 4, 2019, the Court heard oral arguments on Defendant Brigham Young University's ("BYU") Motion for Summary Judgment.[1] Having considered the Motion, Plaintiff John Oirya's Opposition,[2] BYU's Reply,[3] and the arguments presented during the hearing, and for good cause appearing, the Court hereby GRANTS BYU's Motion and dismisses with prejudice all of Mr. Oirya's claims as detailed below:

## STANDARD OF REVIEW

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1219 (10th Cir. 2016). The movant "need only point to those portions of the record that demonstrate an absence of a genuine issue of material fact given the relevant

---

[1] ECF No. 190.
[2] ECF No. 194.
[3] ECF No. 197.

substantive law." *United States v. Simons*, 129 F.3d 1386, 1388 (10th Cir. 1997) (*quoting Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir. 1992)).

<u>UNDISPUTED FACTS</u>

Rule 56(c)(1) of the Federal Rules of Civil Procedure states "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (a) citing to particular parts of materials in the record… or (b) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Moreover, "[t]he court need consider only the cited materials." FED. R. CIV. P. 56(c)(3). With this rule in mind, and after a thorough review of the parties' briefs and properly cited, submitted, and admissible evidentiary materials, the Court determines that the following facts are undisputed:

1.      Mr. Oirya was a BYU student from 2002 to 2013.[4]

2.      In the winter semester of 2013, however, he was accused of three separate incidents of student misconduct: 1) admissions and immigration fraud; 2) plagiarism; and, 3) sexual misconduct toward a female student.[5]

3.      Regarding the first incident, on January 10, 2013, BYU gave Mr. Oirya a document entitled "Allegation and Invitation to Respond" accusing him of "falsely claim[ing] that he was receiving [required] funding" for his education from the Kenyan government and supplying "forged documents" in support of that claim.[6]

---

[4] *See* Amd. Compl., ECF No. 25, ¶ 6; Oirya's Academic Tr., ECF No. 190, Ex. 1.
[5] *See* ECF No. 25, ¶¶ 14, 45–132; ECF No. 190, Ex. 2, 4.
[6] *See* ECF No. 190, Ex. 2; Oirya Dep. 101:17–102:24, Jan. 15, 2019, ECF No. 190, Ex. 3.

4.     On January 25, 2013, BYU gave Mr. Oirya another "Allegation and Invitation to Respond" document accusing him of the remaining two violations of university policy: 1) plagiarism in an assignment and in a "Linguistics Masters [thesis] proposal,"; and 2) an allegation of sexual harassment.[7]

5.     The plagiarism allegation charged Mr. Oirya with copying significant portions of his academic writing from sources available publicly, such as Wikipedia, and failing to adequately attribute scholarly research.[8]

6.     Regarding the sexual harassment accusation, the January 25, 2013 document explained that a female student had accused Mr. Oirya, while in class, of "plac[ing] a piece of paper on his lap, unbutton[ing] and unzip[ing] his pants, h[olding] the piece of paper on his lap with his left hand and reach[ing] into his open pants with his right hand." Mr. Oirya also "engaged in retaliatory behavior" by "call[ing] together the male students" in their class "to learn the identity of the female who had reported him . . . [,]" as BYU originally kept the accuser's identity confidential.[9]

7.     These documents invited Mr. Oirya to "prepare [his] own personal written response" and promised him a "reasonable time" to do so.[10]

### *Mr. Oirya's response to the plagiarism allegations.*

8.     On February 4, 2013, Mr. Oirya submitted a four-page written response, with twenty-six pages of exhibits, to the allegation that he plagiarized an assignment.  He did not deny

---

[7] ECF No. 190, Ex. 4; *see* Oirya Dep. 139:18–142:25.
[8] *See* ECF No. 190, Ex. 4.
[9] *Id.*; *see* Oirya Dep. 141:9–142:25.
[10] ECF No. 190, Ex. 2, 4.

the plagiarism. Rather, he blamed his professor and BYU generally for not adequately teaching him that "substantially lift[ing] from Wikipedia . . . is a form of plagiarism." [11]

9.      The same day, he submitted a separate five-page response, with fifteen pages of exhibits, to the allegation of plagiarism in his master's thesis. He similarly did not deny that plagiarism but said his professors "could have acted more responsibly in helping [him] avoid the alleged charges of plagiarism" but did not give him "critically needed feedback." He speculated "their feedback could have made a big difference in enabling [him] to avoid plagiarism . . . ."[12]

### *Mr. Oirya's response to the sexual harassment allegations.*

10.      Mr. Oirya was provided a copy of the unidentified Title IX accuser's written complaint.[13]

11.      On January 14, 2013, the accuser met with another professor in the Mass Communications Program, Dr. Plowman, who told her that Mr. Oirya "was having a meeting with all the guys in the program." The accuser later spoke to one of those men who said that Mr. Oirya, "was trying to figure out who made the report."[14]

12.      The accuser later said she was "in a constant state of anxiety" as a result of Mr. Oirya's conduct. "For the first time in my life I am wearing a 'rape whistle' at all times," she wrote. She further explained that if Mr. Oirya was allowed to stay in the program, she would have to consider "dropping out of the program and leaving BYU."[15]

---

[11] ECF No. 190, Ex. 5 at 2; *see* Oirya Dep. 115:2–116:15.
[12] *See* ECF No. 190, Ex. 6; Oirya Dep. 120:11–122:15.
[13] *See* ECF No. 190, Ex. 7.
[14] *Id.* at 1–2.
[15] *Id.*

13.     On February 14, 2013, Mr. Oirya submitted an eight-page response, with 17 pages of exhibits, to the Title IX allegations.[16]

14.     In his response, Mr. Oirya called the allegations "categorically false, unfounded, inconceivable and slanderous," but also invited "necessary disciplinary actions" if BYU "determines this charge to be substantiated ...."[17]

15.     Mr. Oirya's response largely consisted of explaining that "no normal person" would have reacted as the accuser did.[18]

16.     Mr. Oirya also denied asking classmates for the name of his accuser. He acknowledged, however, that he met with his male classmates but claims it was merely to ask "my close friends (such as my classmates) for suggestions and guidance on how to proceed forward with this matter."[19]

17.     Mr. Oirya also wrote that the accuser had "brought upon herself unnecessary 'anxiety' and unjustified 'psychological toll' by choosing to misconstrue my intentions and perceive me only in a bad light." He further stated, "if I were to be given the opportunity to know who this individual is, I would be glad to take her to lunch, and apologize to her for the pain and suffering that I might have inadvertently caused to her."[20]

---

[16] ECF No. 190, Ex. 8.
[17] *Id.* at 1.
[18] *Id.* at 2–3.
[19] *Id.* at 5.
[20] *Id.* at 8.

18.     Recognizing that Mr. Oirya could not fully respond without knowing the accuser's identity, BYU obtained permission from the accuser and provided her identity to him, whereupon Mr. Oirya submitted another four-page response on February 25, 2013.[21]

19.     In his additional response, Mr. Oirya explained he had always treated his accuser as a friend but had "mostly felt some sense of lukewarm welcome and hostility from her." Given her "lukewarm and hostile" attitude, Mr. Oirya speculated that "any minor or trivial act on my part (be it real, perceived, imagined or even contrived) could have triggered such an accelerated and uncontrollable hyper-reaction from [the accuser] toward me."[22]

20.     Mr. Oirya's subsequent response also offered speculation about why his accuser might have raised allegations against him. "I might have tucked my un-tucked shirt or T-shirt into my pants as an act of trying to dress modestly. However, the complainant might have misconstrued my actions to be 'scratching' my crotch."[23]

### *Mr. Oirya's response to the academic fraud allegations.*

21.     As a foreign student, Mr. Oirya was required by law and university policy to have proof of financial stability to support himself in the United States. As such, he, or his uncle, submitted a letter, purportedly from the Kenyan government, showing financial support.[24]

---

[21] ECF No. 190, Ex. 9.
[22] *Id.* at 1–2.
[23] *Id.* at 3.
[24] ECF No. 190, Ex. 10. Mr. Oirya asserts his uncle deceived BYU rather than Mr. Oirya himself. He does not explain how this distinction is material. Mr. Oirya does not deny that law and policy required him to prove financial stability. Also, Mr. Oirya was aware of the documents BYU received, whether from Mr. Oirya or his agent, indicating the Kenyan government would provide him money. Nonetheless, Mr. Oirya testified that he never received money from the Kenyan government despite the representations made to BYU.

22.     During a routine check of his financial documents, however, BYU's International Student Services Office ("ISSO") contacted the Kenyan embassy and was informed for the first time that the letter may be fraudulent, whereupon BYU launched an investigation and informed Mr. Oirya of its concerns about his documentation.[25]

23.     Mr. Oirya did not provide a formal written response to this admissions fraud allegation, but on October 3, 2012, he transmitted an email to ISSO Director Sam Brown indicating, "I spoke with the Kenyan embassy staff and they [also] told me that there could be a problem with the authenticity of my Bursary offer letter."[26]

24.     Mr. Oirya directed BYU to discuss the fraud allegation with his uncle, Mr. Fred Odhiambo, who Mr. Oirya alleged "had information on [that] allegation" and could "respond to BYU on behalf of Mr. Oirya."[27]

25.     On October 17, 2012, Mr. Odhiambo emailed Mr. Brown informing him that "some ministry people were colluding with conmen not to forward [the bursary money]" and Mr. Oirya was "becoming a victim of an evolving syndicate that was trying to divert his bursary money to some underground deals."[28]

26.     On November 8, 2012, Mr. Odhiambo emailed Mr. Brown again, stating "the money was being delayed in being processed" because "some individuals in the government [] were working on diverting this money to themselves." He also explained that "[t]he Kenyan

_____

[25] ECF No. 190, Ex. 11.
[26] ECF No. 190, Ex. 12.
[27] Amd. Compl. ¶ 33. On December 12, 2017, BYU filed a short form discovery motion, ECF No. 49, to get contact information for Mr. Odhiambo. BYU used that information to attempt to contact him, but Mr. Odhiambo never responded and was, therefore, never deposed. *See* ECF No. 190, Ex. 13.
[28] ECF No. 190, Ex. 14 at 2.

Embassy in Washington, DC USA is directly involved in this matter and is keenly following up on the outcomes of the ongoing investigations. It will keep you posted."[29]

27.     However, Mr. Oirya was never able to demonstrate he had the financial backing from the Kenyan government that he previously had claimed in the admissions process, and no one from the Kenyan Embassy ever contacted BYU or authenticated the letter.[30]

28.     During his deposition, Mr. Oirya acknowledged he never received money from the Kenyan government.[31]

### *BYU's Fair Investigative Steps*

29.     During BYU's investigation of the sexual harassment, Mr. Oirya met with BYU Title IX Investigator Melba Latu to discuss the allegations.[32]

30.     He met at least twice with BYU Title IX Coordinator Sarah Westerberg to discuss the allegations.[33]

31.     He met at least twice with BYU's ISSO Director Sam Brown to discuss the admissions fraud allegations, and testified to meeting "multiple times" with Ms. Westerberg and Mr. Brown during the investigative process.[34]

32.     Mr. Oirya also had "at least three, maybe four meetings" with BYU Associate Dean of Students Neal Cox to discuss the allegations.[35]

---

[29] ECF No. 190, Ex. 15 at 3.
[30] Hepari Dep. 77:3–78:8, Oct. 17, 2018, ECF No. 190, Ex. 16; Cox. Dep. 93:12–94:1, Oct. 16, 2018, ECF No. 190, Ex. 17.
[31] Oirya Dep. 56:11–60:12.
[32] *See id.* at 148:5–8.
[33] *See id.* at 148:9–19.
[34] *Id.* at 69:8–25, 149:9–25.
[35] *Id.* at 147:9–148:4.

33.     Mr. Cox described his interactions with Mr. Oirya during the investigation as follows:

> More than any student I ever worked with in 20 years, John was demanding information far and way beyond what we ordinarily would supply students with. I attempted to be patient. I attempted to do all I could to supply what information he had a legal right to and access to. . . I wanted to be thorough, but I was anxious to conclude this matter which had extended out for a long period of time, much longer than most any honor code case I remember working with.[36]

34.     BYU personnel also interviewed at least five fact witnesses while investigating the foregoing allegations.[37]

### *Mr. Oirya's Suspension and Dismissal*

35.     On March 4, 2013, after Associate Dean Neal Cox interviewed Mr. Oirya and, after "a thorough review of available information," BYU suspended Mr. Oirya.[38]

36.     Mr. Oirya exercised his rights to "request an administrative review [] of any Decision resulting in a disciplinary action." Pursuant to BYU's policy, the review was directed to the Dean of Students Vernon Heperi, who had the authority to "modify the sanction applied to the student based upon the [r]eview."[39]

37.     On March 19, 2013, Mr. Oirya met with Mr. Cox and Mr. Heperi so that Mr. Heperi could interview Mr. Oirya for the administrative review.[40]

38.     Immediately following that meeting, Mr. Oirya emailed Mr. Heperi, "It was great to have a review with you . . . I had earlier [] feared that I might not be given any opportunity to

---

[36] Cox Dep. 81:6–11, 83:15–18.
[37] *See* BYU's Resp. Interrog. No. 4, ECF No. 190, Ex. 18.
[38] ECF No. 190, Ex. 19.
[39] *See* ECF No. 190, Ex. 20 at 5–6, 9.
[40] *See* ECF No. 190, Ex. 21 at 2.

speak" during the appeal, but "you met and exceeded these expectations ... I can now recommend any student to come and directly talk to you more openly, contrary to my earlier fears that I had about you."[41]

39.     After meeting with Mr. Oirya, Mr. Heperi exercised his powers under the Honor Code Policy and modified the sanction against Mr. Oirya to permanent dismissal from the university. In a letter dated March 20, 2013, Mr. Heperi stated to Mr. Oirya as follows: "After carefully reviewing your most recent violations of the Honor Code, i.e., inappropriate gender-based behavior and admission fraud, and in light of your past history of misconduct at the university I have determined to dismiss you from Brigham Young University."[42]

### *Mr. Oirya Applies to Auburn University*

40.     On January 20, 2013, well *before* his suspension and dismissal from BYU, Mr. Oirya submitted an application to Auburn University for matriculation into its Ph.D. program in business management.[43]

41.     The Auburn application asked Mr. Oirya to "[l]ist in order (most recent first) all colleges and universities [he had] attended." Mr. Oirya did not list his most recent academic programs at BYU on the application.[44]

42.     Mr. Oirya did submit BYU transcripts to Auburn, but they were dated November 14, 2011.[45]

---

[41] *Id.*
[42] ECF No. 190, Ex. 22.
[43] *See* ECF No. 190, Ex. 23 at 5.
[44] *Id.*
[45] *Id.* at 17–19.

43.     Mr. Oirya admitted during his deposition he did not disclose to Auburn that he was enrolled at BYU or that he was dismissed from BYU after 2011, though Mr. Oirya states he submitted updated transcripts that evidenced his enrollment post-2011.[46]

44.     Mr. Oirya was accepted by Auburn's Ph.D. program.[47]

45.     On February 2, 2015, however, Mr. Oirya's estranged wife sent a letter to Auburn informing it for the first time that "[Mr. Oirya] had been expelled from Brigham Young University."[48]

46.     After receiving the letter, Auburn reached out to BYU and asked for information regarding Mr. Oirya. In response, BYU explained the allegations against Mr. Oirya and said he had been suspended and then dismissed.[49]

47.     On March 5, 2015, Auburn rescinded Mr. Oirya's admission to Auburn University because "the information regarding [his] standing at BYU was not provided by [him]" when he applied to Auburn.[50]

48.     On October 10, 2017, Mr. Oirya filed an action in the United States District Court for the Middle District of Alabama in the case of *John Oirya v. Auburn University*, Case No. 3:17-cv-681 (the "Auburn Case"), Mr. Oirya alleged that he had been improperly dismissed from Auburn University.[51]

---

[46] *See* Oirya Dep. 231:8–241:23.
[47] Amd. Compl. ¶ 219.
[48] ECF No. 190, Ex. 24.
[49] *See* ECF No. 190, Ex. 25.
[50] ECF No. 190, Ex. 26.
[51] ECF No. 191, Ex. 1.

49.    On October 2, 2019, Court in the Auburn Case entered an Order granting Auburn University's summary judgment motion and dismissing Mr. Oirya's claims against it.[52]

50.    That court found that "Oirya was disenrolled and terminated [from Auburn University] because Auburn discovered that [Mr. Oirya] failed to submit an accurate and complete transcript from BYU and was prohibited from re-entering BYU."[53]

### APPLICATION OF THE LAW TO THE UNDISPUTED FACTS

Based on the record, the central question before the Court is whether Mr. Oirya received a process that was fair under the circumstances. Mr. Oirya failed to establish a genuine dispute of material fact on this issue. The undisputed material facts show that BYU provided Mr. Oirya with a considered, determined, fair process that substantially complied with BYU's policies and procedures and all relevant laws.

Mr. Oirya was accused of three separate and independent instances of misconduct: (1) admissions and immigration fraud, (2) plagiarism, and (3) sexual misconduct. As the undisputed material facts show, Mr. Oirya admitted that he never received funds from the Kenyan government as he had previously represented to BYU. He also admitted the allegations of plagiarism, though he explained that, in his view, he could have been better taught about what plagiarism is. His explanation does not change his admitted plagiarism on two different occasions. These admissions by Mr. Oirya to the first and second allegations of misconduct, in and of themselves, justify BYU's decision to discipline Mr. Oirya. Because the process provided to Mr. Oirya was fair, and because Mr. Oirya admitted to two of the three charges of misconduct,

---

[52] *Id.*
[53] *Id.* at 39.

no reasonable juror could conclude that BYU's decision to discipline Mr. Oirya was improper. As a result, each of Mr. Oirya's claims fail as a matter of law and are dismissed, as explained more fully below.

## 1. Mr. Oirya's Contract Claims Fail.

Mr. Oirya asserted claims for breach of contract and breach of the covenant of good faith and fair dealing.[54] The premise for both claims is Mr. Oirya's allegation that BYU breached a contractual duty to provide him with (1) notice of his alleged misconduct and (2) an opportunity to respond. This alleged contractual duty is found in BYU's Honor Code Policy.[55] As the Tenth Circuit has not defined the relationship between a private university and its students as contractual, but other circuits have, this Court will assume, but not decide, the existence of a contract between Mr. Oirya and BYU. *Compare Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir. 1998) ("The student-college relationship is essentially contractual in nature. The terms of the contract may include statements provided in student manuals and registration materials.") (internal citations omitted) *with Mittra v. Univ. of Med. & Dentistry of New Jersey*, 316 N.J. Super. 83, 719 A.2d 693, 694 (App. Div. 1998) (explaining that "the relationship between the university and its students should not be analyzed in purely contractual terms.").

Assuming a contract existed between Mr. Oirya and BYU, BYU did not breach its contractual duty to provide Mr. Oirya notice or an opportunity to respond pursuant to BYU's Honor Code. Mr. Oirya was provided with notice of each of his alleged violations.[56] Mr. Oirya was also provided an opportunity to respond to each charge—and availed himself of that

---

[54] ECF No. 25.

[55] ECF No. 190, Ex. 20 at 2.

[56] *See* ECF No. 190, Ex. 2, 4.

opportunity. *Id.* As detailed above, Mr. Oirya submitted a four-page written response, with 26

pages of exhibits, to the allegation that he plagiarized an assignment and a separate five-page

response, with 15 pages of exhibits, to the allegation of plagiarism in his master's thesis.[57] In

neither submission did he deny the charge of plagiarism. *Id.* In response to the Title IX

allegations, Mr. Oirya submitted an initial eight-page written response, with 17 pages of exhibits,

and a subsequent four-page written response.[58] While Mr. Oirya did not submit a formal written

response to the admissions and immigration fraud allegation, he transmitted an email to ISSO

Director Sam Brown indicating, "I spoke with the Kenyan embassy staff and they [also] told me

that there could be a problem with the authenticity of my Bursary offer letter."[59] Mr. Oirya's

uncle, Fred Odhiambo, also responded to that allegation on behalf of Mr. Oirya.[60] Ultimately,

however, Mr. Oirya was not able to demonstrate he had the financial backing from the Kenyan

government that he previously had claimed in the admissions process, and no one from the

Kenyan Embassy ever contacted BYU or authenticated the letter.[61] Mr. Oirya acknowledged he

never received money from the Kenyan government.[62]

In addition to Mr. Oirya's written responses to the allegations of misconduct, Mr. Oirya

also had numerous personal interviews with BYU personnel regarding these charges. Mr. Oirya

met with BYU Title IX Investigator Melba Latu, at least twice with BYU Title IX Coordinator

Sarah Westerberg, at least twice with BYU's ISSO Director Sam Brown, at least three times with

---

[57] *See* ECF No.190, Ex. 5–6.
[58] *See* ECF No. 190, Ex. 8–9.
[59] *See* ECF No. 190, Ex. 12.
[60] *See, e.g.,* ECF No. 190, Ex. 14.
[61] *See* Hepari Dep. 77:3 – 78:8; Cox. Dep. 93:12 – 94:1.
[62] *See* Oirya Dep. 56:11 – 60:12.

14

BYU Associate Dean of Students Neal Cox, and once with BYU Dean of Students Vernon Heperi. BYU also interviewed eleven fact witnesses while investigating these allegations.

In light of the undisputed facts regarding the process provided to Mr. Oirya, the Court concludes that BYU complied with its alleged contractual duty to provide Mr. Oirya with notice of the allegations and an opportunity to respond. Consequently, BYU did not breach its contractual duties or its duty of good faith and fair dealing and Mr. Oirya's claims for breach of contract and breach of the duty of good faith and fair dealing fail as a matter of law. Moreover, because Mr. Oirya admitted to two of the three allegations of misconduct, the Court cannot conclude that BYU's process led to an inappropriate outcome. In short, BYU did not breach its contractual duties to provide Mr. Oirya with a fair process, and even if it did, such breach was not the cause of Mr. Oirya's alleged damages—his own admitted misconduct was.

**2. Mr. Oirya's Defamation Claim Fails.**

Mr. Oirya's third cause of action alleges BYU defamed him by informing Auburn about his misconduct, suspension, and dismissal.[63] His defamation claim fails because Mr. Oirya failed to submit any evidence creating a disputed issue of material fact about whether what BYU said to Auburn was false. To the contrary, the undisputed evidence established that BYU did not say anything untrue to Auburn. His claim also fails because the undisputed facts also showed that the statements were privileged, the statute of limitations has run, and because BYU's statements were not the cause of his dismissal from Auburn.

Truth is an "absolute defense" to a defamation claim. *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 57 (Utah 1991). BYU notified Auburn that allegations were made against Mr. Oirya and

---

[63] Amd. Compl. ¶ 246.

that BYU investigated, suspended, and dismissed him, which is all indisputably true.[64] Mr. Oirya's defamation claim fails because BYU's statements to Auburn were true.

Even if some portion of BYU's statement was not true, Mr. Oirya's defamation claim would still fail because BYU's statements are privileged. "Under Utah law, 'false and defamatory statements are not actionable if they are protected by a legal privilege.'" *Lifevantage Corp. v. Domingo*, 208 F. Supp. 3d 1202, 1220 (D. Utah 2016) (quoting *DeBry v. Godbe*, 1999 UT 111, 992 P.2d 979, 982). A qualified privilege applies when "a defendant seeks to vindicate or further an interest regarded as being sufficiently important to justify some latitude for making mistakes." *Brehany*, 812 P.2d at 58 (internal quotations omitted). "When circumstances mandate wholly open, frank, and unchilled communication, the law readjusts the scales that balance the right to free expression with the interest in protecting one's reputation." *O'Connor v. Burningham*, 2007 UT 58, ¶ 29, 165 P.3d 1214. "Th[is] privilege [] extends to statements made to advance a legitimate common interest between the publisher and the recipient of the publication." *Ferguson v. Williams & Hunt, Inc.*, 2009 UT 49, ¶ 27, 221 P.3d 205, 214 (internal quotations omitted). Thus, "an employer's communication to other interested parties concerning the reasons for an employee's discharge" are privileged. *Id.*; *see also Brehany*, 812 P.2d at 59

---

[64] ECF No. 190, Ex. 22. Mr. Oirya alleged in his opposition memorandum that additional statements were made to Auburn but did not support that contention by citation to any admissible evidence. Thus, the Court does not consider these statements in reaching its conclusion. FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials.") But even if such additional statements were made and properly presented to the Court, such statements are not actionable in this case for the other reasons discussed herein. Namely, BYU's statements were privileged, Mr. Oirya's defamation claim was untimely, and the alleged defamatory statements were not the cause of Mr. Oirya's alleged harms, as was found by our sister court in the Middle District of Alabama.

(finding privilege when management informed employees and buyers of former employees' termination for drug use).

Just as an employer is privileged in communicating to potential employers the reasons for an employee's discharge, a university is undoubtedly privileged in explaining to other universities why a student was dismissed. In fact, a number of courts have found that transmission of statements related to disciplinary proceedings are privileged. *See, e.g.*, *Doe v. Salisbury Univ.*, 123 F. Supp. 3d 748, 761 (D. Md. 2015) (statements shared to a University regarding sexual assault are privileged); *Melious v. Besignano*, 125 A.D.3d 727, 728–29, 4 N.Y.S.3d 228 (N.Y. App. Div. 2015) (finding privilege when statements were made in "official capacity" during teacher disciplinary proceeding, and dissemination of information was to others with "corresponding interests in the subject matter"); and *Beauchene v. Mississippi Coll.*, 986 F. Supp. 2d 755, 767 (S.D. Miss. 2013) (qualified privilege exists during disciplinary proceedings due to Universities "obligation to ferret out such conduct").

The case of *Gomes v. University of Maine System* is instructive. There, a plaintiff's defamation claim was based on university officials speaking about plaintiff's sexual assault disciplinary proceeding with news agencies, the NCAA, and the student's new institution. *Gomes*, 365 F. Supp. 2d at 43 (D. Mn. 2005). The court dismissed this claim because "a university disciplinary proceeding for a student is a setting 'where society has an interest in promoting free, but not absolutely unfettered speech,' and the conditional privilege attaches to university statements concerning the proceeding." *Id.* (quoting *Lester v. Powers*, 596 A.2d 65, 69 (Me. 1991)). BYU is on all fours with *Gomes*. In fact, BYU's situation is more compelling because Mr. Oirya makes no allegation BYU disseminated information to the public. It is simply

a question of sharing disciplinary files school-to-school, as permitted by law. This kind of candor must be permitted or universities will have to remain silent even when a transferring student may pose a danger. Thus, the Court concludes that any statements made by BYU to Auburn were privileged and Mr. Oirya's defamation claim fails for this additional reason.

In any event, another court has already found that Mr. Oirya was dismissed from Auburn because of his own false statements and not because of any statements from BYU.[65] Mr. Oirya is estopped from challenging this finding. *Gudmundson v. Del Ozone*, 2010 UT 33, ¶ 37, 232 P.3d 1059. Because Mr. Oirya was dismissed from Auburn due to his own false statements, Mr. Oirya cannot establish a causal link between BYU's alleged defamatory statements and the damages, if any, stemming from his dismissal from Auburn. This is fatal to his defamation claim and provides a third, independent basis for dismissal of this claim.

Finally, Mr. Oirya's defamation claim is also barred by the statute of limitations. In Utah, an action for defamation must be brought within one year. Utah Code § 78B-2-302(4). Here, the alleged defamatory conduct occurred on February 18, 2015.[66] Mr. Oirya did not file his complaint until October 31, 2016—one year and eight months later. Mr. Oirya alleged that the discovery rule applies and saves his claim from dismissal. However, the record contains no evidence that BYU concealed its conduct and the discovery rule does not apply. *See Russell Packard Dev., Inc. v. Carson*, 2005 UT 14, P 25, ¶¶ 34–43, 108 P.3d 741.

The Court concludes that Mr. Oirya's defamation claim fails for each of these four independent reasons.

---

[65] ECF No. 191, Ex. 1.
[66] *See* ECF No. 190, Ex. 25.

### 3.   Mr. Oirya's Title IX Claims Fail.

Mr. Oirya asserted four Title IX claims against BYU: due process violations, deliberate indifference, erroneous outcome, and selective enforcement.[67] Title IX provides that "[n]o person … shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).[68] As acknowledged by Mr. Oirya, to prevail on his Title IX claims, he must prove that there was "a causal connection between gender discrimination and the [alleged] wrongful outcome" of BYU's investigatory procedure.[69] As a result, evidence of a "flawed proceeding that has led to an adverse and erroneous outcome" is not enough without evidence of a "causal connection between the flawed outcome and gender bias." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d. Cir. 1994).

Mr. Oirya has presented no evidence to this Court that BYU's decision to suspend, and ultimately dismiss, him was the result of gender bias or discrimination. For this reason, each of

---

[67] ECF No. 25

[68] The Tenth Circuit has held that the framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), *holding modified by Hazen Paper Co. v. Biggins*, 507 U.S. 604, 113 S. Ct. 1701, 123 L. Ed. 2d 338 (1993), applies to Title IX claims. *See Hiatt v. Colorado Seminary*, 858 F.3d 1307, 1315 n.8 (10th Cir. 2017). "Under *McDonnell Douglas*, a plaintiff must first establish a prima facie case for discrimination or retaliation by showing an employer took adverse … action against the plaintiff based on the plaintiff's sex …. The burden then shifts to the employer to articulate a legitimate nondiscriminatory … reason for the adverse action. If the employer satisfies this burden, then summary judgment is warranted unless the plaintiff can show there is a genuine issue of material fact as to whether the proffered reason is pretextual." *Id.* at 1316 (quotation marks, citations, and brackets omitted).

[69] ECF No. 194 at 18 (citing *Vega v. State Univ. of N.Y. Bd. Of Trustees*, No. 97-cv-5767, 2000 WL 381430 at *4 (S.D.N.Y. Apr. 13, 2000)). *See also Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d. Cir. 1994) ("[W]e may safely say that Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline.").

his Title IX claims fail. Further, Mr. Oirya has also failed to establish other elements of each of his four Title IX claims. These deficiencies are discussed further below.

  a.  *Violation of Title IX--Due Process and Procedural Rights*

Mr. Oirya's first Title IX claim—due process and procedural rights—alleges BYU did not provide Mr. Oirya with adequate due process and provided "preferential treatment of Mr. Oirya's female accuser" and "stacked" the investigative process against him "because he is a male."[70] "It is well-established ... that a private university is not required to adhere to the standards of due process guaranteed to criminal defendants or to abide by rules of evidence adopted by courts." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 602 (D. Mass. 2016) (quotation marks omitted). "Since [BYU] is a private college, and not a state actor, the federal Constitution does not establish the level of due process that [BYU] had to give [Mr. Oirya] in his disciplinary proceeding." *Xiaolu Peter Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015) (footnote omitted); *see Rensselaer Soc. of Engineers v. Rensselaer Polytechnic Inst.*, 260 A.D.2d 992, 689 N.Y.S.2d 292, 295 (1999) (private university disciplinary proceedings "do not implicate the full panoply of due process guarantees") (internal quotation marks omitted)).

As detailed above, it is undisputed that Mr. Oirya was given written notice of the Title IX allegations—indeed, he was provided with the name and full written report of his accuser—and he responded in writing (twice) and in person on numerous occasions. Furthermore, BYU conducted an extensive investigation, including interviewing eleven witnesses and meeting with Mr. Oirya several times. Nothing in the record supports Mr. Oirya's claims that the investigation

---

[70] Amd. Compl. ¶ 255.

"plac[ed] special emphasis on the allegations, witnesses, and supposed evidence supplied by his female accusers ... on the basis of his sex or gender."[71]

b. _Violation of Title IX--Deliberate Indifference_

Mr. Oirya's second Title IX claim—deliberate indifference—also fails. To prevail on deliberate indifference, Mr. Oirya must show BYU "(1) has actual knowledge of, and (2) is deliberately indifferent to, (3) harassment that is so severe, pervasive and objectively offensive as to (4) deprive access to the educational benefits or opportunities provided by the school." _Rost ex rel. K.C. v. Steamboat Springs RE-2 Sch. Dist._, 511 F.3d 1114, 1119 (10th Cir. 2008). Here, Mr. Oirya cannot establish deliberate indifference because he does not point to any evidence in the record that BYU acted indifferently. Rather, BYU gave Mr. Oirya notice of the claims against him, investigated the claims, concluded Mr. Oirya was the perpetrator rather than the victim, and upheld that decision on appeal. While Mr. Oirya disagrees with the outcome of the investigation and appeal process, he has not shown BYU was indifferent to any alleged harassment perpetrated against Mr. Oirya. Thus, given the undisputed facts in the record, Mr. Oirya's deliberate indifference claim fails.

c. _Violation of Title IX--Erroneous Outcome_

Mr. Oirya's third Title IX claim—erroneous outcome—alleges BYU failed to provide "proper process" and that the process was preferential to his female accusers.[72] To prevail on an erroneous-outcome claim, he must prove that the outcome was erroneous and "that gender bias was a motivating factor" in that outcome. _Doe v. Trustees of Bos. Coll._, 892 F.3d 67, 90 (1st Cir.

---

[71] Amd. Compl. ¶ 22.
[72] Amd. Compl. ¶¶ 267-269.

2018). Mr. Oirya has not shown the outcome was erroneous; nor is there any evidence that gender was a motivating factor in his suspension or dismissal. "To show this causal link," Mr. Oirya "cannot merely rest on superficial assertions of discrimination but must establish that particular circumstances suggest that gender bias was a motivating factor." *Id.* at 91 (quotation marks and brackets omitted). Mr. Oirya offers no evidence of bias in the written policies; no evidence of any kind of systemic bias against males; and no evidence of particularized bias in his case.

d.  *Violation of Title IX--Selective Enforcement*

Mr. Oirya's fourth Title IX claim—selective enforcement—alleges BYU's investigation into his misconduct was "motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings."[73] To prevail, he must show that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. "To support a claim of selective enforcement, a male plaintiff must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." *Xiaolu Peter Yu*, 97 F. Supp. 3d at 480 (quoting *Mallory v. Ohio Univ.*, 76 F. App'x 634 (6th Cir. 2003)). That is, he must show that BYU's actions against him "were motivated by his gender and that a similarly situated woman would not have been subjected to the same disciplinary proceedings." *Doe v. Univ. of the S.*, 687 F. Supp. 2d 744, 757 (E.D. Tenn. 2009). Mr. Oirya has not presented any evidence of selective enforcement. He has presented no evidence of any similarly situated women who were treated more favorably.

---

[73] *Id.* ¶ 273.

In sum, Mr. Oirya has failed to present evidence that BYU's decision to terminate his enrollment was motivated by gender bias. Mr. Oirya has also failed to establish other elements of each of his four Title IX claims. For these reasons, the Court concludes that his Title IX claims fail as a matter of law.

### 4. Mr. Oirya's Tort Claims Fail.

Finally, Mr. Oirya alleges two tort claims: negligence and intentional infliction of emotional distress ("IIED"). Both claims fail.

An essential element of any negligence claim is a breach of a duty. *See Earl v. LaVerkin City*, 2016 UT App 196, ¶ 11, 382 P.3d 676. Mr. Oirya alleges BYU breached its duty to "carry out a reasonable and fair investigation into the allegations against him, as outlined in its school and employment policies."[74] As noted above, BYU provided Mr. Oirya with notice of the three allegations of misconduct and invited him to respond. Mr. Oirya responded to all three allegations in writing and in person. BYU also interviewed 11 witnesses and met with Mr. Oirya numerous times. The record before the Court establishes that BYU engaged in a determined and fair process. Therefore, BYU did not breach any duty to carry out a reasonable and fair investigation and Mr. Oirya's negligence claim fails.

As to his IIED claim, Mr. Oirya failed to present any evidence from which a rational fact-finder could concluded that BYU intended to cause him emotional damage. *See Bennett v. Jones, Waldo, Holbrook & McDonough*, 2003 UT 9, ¶ 58, 70 P.3d 17 (noting that an essential element of IIED is "intentionally engag[ing] in some conduct toward the plaintiff, ... with the purpose of

---

[74] *Id.* ¶ 300.

inflicting emotional distress"). To the contrary, Mr. Oirya expressed satisfaction with the process BYU afforded to him. For this reason, Mr. Oirya's IIED claim fails.[75]

**ORDER**

For all of the above reasons, it is hereby ORDERED that BYU's Motion for Summary Judgment is GRANTED and all of Mr. Oirya's claims are dismissed with prejudice. Judgment shall be entered accordingly.

IT IS SO ORDERED.

DATED this ___9___ day of January 2020.

BY THE COURT

_____

Hon. Bruce S. Jenkins
U.S. Senior District Judge

---

[75] Additionally, given the court's assumption that a contract governs the relationship between the parties, the tort claims are also barred by the economic-loss doctrine. *See Reighard v. Yates*, 2012 UT 45, ¶¶ 14–21, 285 P.3d 1168.